UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DENNIS MIKEL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:16-cv-01795-JMS-DML ) |
| DOCTOR IPPEL[1], et al, | ) ) |
| Defendants. | ) |

**Entry Discussing Motions for Summary Judgment**

Plaintiff Dennis Mikel, an inmate at the New Castle Correctional Facility (NCCF), brings this action pursuant to 42 U.S.C. § 1983 alleging that the defendants have violated his rights by failing to treat his medical conditions, including a hernia, gastroesophageal reflux disease, neck pain, and allergies. Defendants Nurse Leann Ivers, NP Barbara Brubaker, Megan Miller, Dr. Christopher Nelson, NP Deborah Perkins and Dr. Bruce Ippel (the Medical Defendants) seek summary judgment on these claims, as has Mr. Mikel. For the following reasons, the Medical Defendants' motion for summary judgment is **granted in part and denied in part** and Mr. Mikel's motion for summary judgment is **denied**.

**I. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable

---

[1] The records reflect that the proper spelling of Dr. Ippels' name is Dr. Ippel. The **clerk shall modify** the docket to reflect this spelling.

inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490. Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001). Even though the parties have filed cross motions for summary judgment, the general standards for summary judgment do not change: with "cross summary judgment motions, we construe all facts and inferences therefrom 'in favor of the party against whom the motion under consideration is made.'" *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006).

## II. Facts

The following statement of facts has been evaluated pursuant to the standards set forth above. Because Mr. Mikel and the Medical Defendants have each moved for summary judgment, most of the facts are taken from Mr. Mikel's medical records and, to that extent, are undisputed. Facts that are disputed will be identified as appropriate.

Mr. Mikel transferred from the Miami Correctional Facility (MCF) to NCCF in October of 2014. While he was at MCF, he was treated by Dr. Kim Myers for a hernia, arthritis, neck pain, acid reflux, and an enlarged prostate. Dkt. 78-23. Dr. Myers prescribed Naprosyn for his arthritis, which helped his neck pain. Dkt. 78-23. She also offered a hernia belt and a bottom

2

bunk pass for treatment of his hernia. Dkt. 78-23. She prescribed him Zantac for his reflux. Dkt. 78-23. Mr. Mikel challenges the treatment he received for his neck pain, GERD, and hernia while he has been at NCCF. He also alleges that the defendants have been deliberately indifferent to his allergies to aspirin and bleach.

A. *Neck Pain*

On October 31, 2014, after he was transferred to NCCF, NP Perkins saw Mr. Mikel for neck pain that she noted was moderate and intermittent. Dkt. 90-4. She noted that he was in a motor vehicle accident two years earlier and had disc problems in his neck that resulted in mild pain and tenderness. *Id.* Mr. Mikel states that he actually told NP Perkins that he was in a car accident 22 years ago and suffered a mild case of whiplash. Dkt 78-23. He says he told her that Naproxen worked for his pain and over the counter medications did not. Dkt. 78-23. She sent a non-formulary request for Naproxen for his pain. Dkt. 90-4.

On January 16, 2015, Mr. Mikel saw NP Perkins again. Dkt. 90-1; 90-4. While she noted that he reported that his neck pain was moderate and fairly controlled, he says that his pain was severe and that his prescription medication helped. Dkt. 90-1; Dkt. 78-23. NP Perkins told him that she would submit a non-formulary request for Naprosyn,[2] but that if this was not approved he would have to purchase Aleve from the commissary. Dkt. 90-4; Dkt. 90-2, pg 255. His prescriptions, including Naprosyn and Zantac, were continued. Dkt. 90-1.

---

[2] The parties use these medication names interchangeably and Naprosyn appears to be a brand name for Naproxen. *See* MedicineNet.com, *Ibuprofen (Advil) vs. Naproxen (Aleve) for Pain: Comparison of Differences*, https://www.medicinenet.com/ibuprofen_vs_naproxen/article.htm#ibuprofen_advil_motrin_vs_naproxen_aleve_comparison_of_differences (visited September 4, 2018).

On July 21, 2015, Mr. Mikel saw NP Brubaker for a chronic care visit. Dkt. 90-1. In response to Mr. Mikel's complaints of neck pain, NP Brubaker ordered Naprosyn and noted that he should avoid aspirin. Dkt. 90-4; Dkt. 90-2, pg 140. It appears that the non-formulary request for Naprosyn was denied, but it is unclear who denied the request. Dkt. 90-4. Mr. Mikel believes that NP Brubaker discontinued these medications, dkt, 78-23, but NP Brubaker did not control whether these medications would be approved. Dkt. 90-4.

Mr. Mikel saw Dr. Christopher Nelson on October 15, 2015. Dkt. 90-1; 902-, pg. 130-33. Referring to this visit, Mr. Mikel says, "Dr. Nelson added back my Naprosyn and Prilosec, but no order was ever generated." Dkt. 78-23.

On December 7, 2015, NP Brubaker ordered a renewal of Naproxen 500 mg for ninety days. Dkt. 90-5; Dkt. 90-2 pg 123. This orders was apparently filled.

In December 2015, Mr. Mikel submitted requests for health care asking for an egg crate mat for his mattress to help alleviate his neck pain. Dkt. 78-17.

On January 11, 2016, Dr. Ippel saw Mr. Mikel for a chronic care visit. Dkt. 90-1. He stated that he uses Naprosyn to treat his neck pain. Dkt. 90-1. Dr. Ippel saw Mr. Mikel again on March 30, 2016, for a chronic care visit. Dkt. 90-1. Dr. Ippel states that Mr. Mikel reported he was doing well on his current medication regimen. Dkt. 90-1. He had been approved for non-formulary Naprosyn. Dkt. 90-1. Mr. Mikel states, to the contrary, that he told Dr. Ippel that he was not receiving his medications on a regular basis. Dkt. 78-23.

On May 23, 2016, Mr. Mikel submitted a request for health care stating that he had not received his Naproxen refill. Dkt. 78-17, pg. 58. On June 16, 2016, Dr. Ippel ordered renewal of Naproxen for 90 days. Dkt. 90-5; Dkt. 90-2.

Mr. Mikel saw NP Brubaker on July 21, 2016, for a chronic care visit. Dkt. 90-1; Dkt. 90-5; Dkt. 90-2, pg. 90. The medical records reflect that he stated that his neck pain was moderate and had not changed. Dkt. 90-1. Mr. Mikel says he told NP Brubaker that the pain in his neck was so bad that he felt like he was having a stroke. Dkt. 78-23. He continued with his prescription for Naprosyn. Dkt. 90-1; dkt. 90-5.

On September 17, 2016, Mr. Mikel requested a renewal of his medications. Dkt. 90-5; Dkt. 90-2, pg. 197. He was told to discuss the request with the doctor because his prescriptions had already expired. Dkt. 90-5; Dkt. 90-2, pg. 197.

On September 22, 2016, NP Brubaker requested a refill of Naproxen. Dkt. 90-5; Dkt. 90-2, pg. 80, 82. The records state: "Medical director note of 8/16/16 states that this med will not be renewed after next CCC visit." Dkt. 78-13.

On September 28, 2016, Dr. Ippel saw Mr. Mikel for a chronic care visit. Dkt. 90-1. Dr. Ippel informed Mr. Mikel that his prescription for Naproxyn was only for periodic symptomatic control and that he did not require a long-term, uninterrupted prescription for this medication. Dkt. 90-1. Mr. Mikel's prescription was scheduled to be stopped. Dkt. 90-1. Mr. Mikel saw Dr. Ippel on December 16, 2016, for chronic care. Dkt. 78-19. Dr. Ippel told him that he will have to get the nonprescription items on the commissary. *Id.* When Mr. Mikel stated that he had no money, he was told that providers are advised to tell people that their case manager may be able to provide funding for these items if they deem it appropriate. Dkt. 90-2.

B. *GERD*

At his January 16, 2015, visit with NP Perkins, Mr. Mikel reported that his GERD symptoms were improving. Dkt. 90-1; 90-4. He reported that he experienced heartburn that was

aggravated by eating, hot liquids, large meals, spicy foods and lying in a supine position. Dkt. 90-1; 90-4. He was counseled to avoid certain foods in the commissary and on diet control. Dkt. 90-1. His prescription for Zantac was continued. Dkt. 90-1. Mr. Mikel states that NP Perkins "upgraded" his acid reflux diagnosis to GERD and this "freaked [him] out." Dkt. 78-23. On March 15, 2015, Mr. Mikel requested renewal of Zantac. This was ordered on March 18, 2015. Dkt. 90-5; Dkt. 90-2, pg. 182.

When Mr. Mikel saw NP Brubaker for his July 21, 2015, chronic care visit, she ordered Prilosec for his GERD and noted that he should avoid aspirin. Dkt. 90-4; Dkt. 90-2 pg 140. But the non-formulary request for Prilosec was denied. Dkt. 90-4. Again, Mr. Mikel believes that NP Brubaker discontinued his medication, dkt. 78-23, but NP Brubaker did not control whether these medications would be approved. Dkt. 90-4. Mr. Mikel told NP Brubaker that he didn't have a diet or a diet card, but everything else was okay as long as he was getting his medications on time. Dkt. 78-23. He told her about his abdominal pain, that his GERD was getting worse, and that his arthritis was "acting up." Dkt. 78-23.

Mr. Mikel filed a grievance complaining that he was not receiving his medications in August 2015. Megan Miller, the Health Services Administrator, responded to the grievance stating that he was receiving Naprosyn and Prilosec. Dtk. 78-17, pg. 37.

NP Brubaker ordered a renewal of Prilosec on December 7, 2015. Dkt. 90-5; Dkt. 90-2, pg. 123.

At his January 11, 2016, chronic care visit, Mr. Mikel told Dr. Ippel that Prilosec was effective in relieving his reflux symptoms. Dkt. 90-1. On March 28, 2016, Mr. Mikel submitted a request for health care stating that he had not received his prescription for Prilosec. Dkt. 78-17.

6

Dr. Ippel saw Mr. Mikel on March 30, 2016, for a chronic care visit. Dkt. 90-1. Dr. Ippel states that Mr. Mikel reported that he was doing well on his current medication regimen. Dkt. 90-1. He had been approved for non-formulary Prilosec. Dkt. 90-1. Mr. Mikel states that he told Dr. Ippel that he was not receiving his medications on a regular basis. Dkt. 78-23.

On July 21, 2016, NP Brubaker saw Mr. Mikel for a chronic care visit. Dkt. 90-1; Dkt. 90-5; Dkt. 90-2, pg. 90. Mr. Mikel reported that his GERD symptoms were improving. Dkt. 90-1. Mr. Mikel states that his heartburn occurred every time he ate or laid down. Dkt. 78-23. He continued with his prescription Prilosec. Dkt. 90-1; dkt. 90-5.

On August 16, 2016, Dr. Ippel entered a chart update that stated that because Mr. Mikel was taking Prilosec for symptomatic heartburn only, the prescription would not be renewed. Dkt. 90-1; 90-2 pg. 86. He noted that Mr. Mikel would be informed at his next visit that conservative treatment for his heartburn and reflux, such as avoiding spicy foods and other trigger foods, eating smaller meals, weight management, and not eating before bedtime would be recommended. Dkt. 90-1; 90-2, pg. 86. Dr. Ippel states that he believed that Mr. Mikel's GERD complaints were random and episodic and could be controlled by lifestyle changes. Dkt. 90-1; pg 90-2, pg 86. He would advise Mr. Mikel to purchase over the counter Prilosec through the commissary if needed on an episodic basis. Dkt. 90-1; 90-2, pg. 86.

NP Brubaker requested a refill of Mr. Mikel's Prilosec on September 22, 2016. Dkt. 90-5; Dkt. 90-2, pg. 80-82. But the records state that the medical director had determined that this medication would not be renewed. Dkt. 78-13. During his September 28, 2016, chronic care visit, Dr. Ippel told Mr. Mikel that his prescription for Prilosec was only for symptomatic control and would not be renewed. Dkt. 90-1.

C. *Hernia*

Mr. Mikel's medical records contain numerous notations that he suffers from a hernia. Sometimes it is described as a hiatal hernia and sometimes a diaphragmatic hernia. *See, e.g.*, Dkt. 90-2, pgs. 4, 6, 24. When he was confined at MCF, Dr. Myers offered a hernia belt and a bottom bunk pass for this condition. Dkt. 78-23. When Mr. Mikel saw Dr. Nelson on October 15, 2015, he reported that he believed he had a hernia and that it was exacerbated by using a top bunk. Dkt. 90-1. He stated that it felt like his hernia was ripping open more every time he climbed into a top bunk and that he told Commissioner Bruce Lemmon and officials from Corizon about his condition. Dkt. 78-23. Dr. Nelson noted that there was no evidence of incarceration of the hernia.[3] Dkt. 90-2, pg. 133. A bottom bunk pass was issued. Dkt. 78-5. The records state: "Identified risk factors include top bunk." Dkt. 90-2, pg. 133.

When Mr. Mikel saw Dr. Ippel on January 11, 2016, for a chronic care visit, Mr. Mikel complained that he was experiencing lower back pain and abdominal pain that he believed was associated with his hernia condition. Dkt. 90-1. At his September 28, 2016, chronic care visit, Mr. Mikel asked Dr. Ippel to evaluate him for an abdominal hernia. Dkt. 90-1. He stated that he believed the hernia had increased in size and was causing pain during bowel movements. Dkt. 90-1; dkt. 78-5, pg. 55. Dr. Ippel informed Mr. Mikel that he believed his condition was diastasis recti. Dkt. 90-1. But based on Mr. Mikel's complaints, he submitted a request for an outside surgical evaluation. Dkt. 90-1. Dr. Ippel noted that the condition appears with Valsalva maneuvers – attempting to exhale with the nostrils and mouth, or the glottis, closed which

---

[3] An incarcerated hernia is a hernia that is trapped in the abdominal wall. Mayo Clinic, *Inguinal hernia*, https://www.mayoclinic.org/diseases-conditions/inguinal-hernia/symptoms-causes/syc-20351547 (last visited September 7, 2018).

8

increases pressure in the middle ear and the chest, as when bracing to lift heavy objects. Dkt. 90-1. It was not causing pain during the exam. Dkt. 90-1. On October 21, 2016, Mr. Mikel was transported to Vincent Anderson Regional Hospital for evaluation by Dr. Khalil Wakim, a general surgeon. Dkt. 90-1. Dr. Wakim examined Mr. Mikel's upper abdomen and diagnosed the condition as diastasis recti. Dkt. 90-1. He stated that no treatment or follow-up was needed. Dkt. 90-1. Mr. Mikel states that Dr. Wakim did not examine him. Dkt. 78-23.

D. *Allergies*

Mr. Mikel claims that he is allergic to aspirin and bleach, while the Medical Defendants state that he is not. Mr. Mikel has not been prescribed medications that contain aspirin or bleach and has not had an allergic reaction to any of the medications that he has been prescribed.

### III. Discussion

Mr. Mikel claims that the defendants exhibited deliberate indifference to the serious medical needs described above. At all times relevant to Mr. Mikel's claims, he was a convicted inmate. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

A. *Statute of Limitations*

Before addressing the merits of Mr. Mikel's claims, the Court will address NP Perkins's argument that the claims against her are barred by the statute of limitations. The statute of limitations for claims, like Mr. Mikel's, under 42 U.S.C. § 1983 arising from acts taking place in

Indiana is two years. *Behavioral Institute of Indiana, LLC, v. Hobart City of Common Council*, 406 F.3d 923, 929 (7th Cir. 2005). Generally, the statute of limitations runs from the date of the injury. *Pitts v. City of Kankakee, Ill.*, 267 F.3d 592, 595 (7th Cir. 2001); *Wilson v. Groze*, 800 F.Supp.2d 949, 955 (ND Ill. 2011)(citing *Heard v. Sheahan*, 253 F.3d 316, 318-20 (7th Cir. 2001); *Smetzer v. Newton*, 2012 WL 6681702 * 10 (ND Ind. Dec. 21, 2012). Mr. Mikel moved to amend his complaint to add claims against NP Perkins on May 1, 2017, and Mr. Mikel's claims against her are based on acts that took place in October of 2014 and January of 2015. Because Mr. Mikel's claims against NP Perkins are based on acts that took place in January of 2015 at the latest, he had until January 2017 to raise them. Because he did not move to amend his complaint to add NP Perkins as a defendant until May of 2017, his claims against her are barred by the statute of limitations. NP Perkins is entitled to summary judgment on the claims against her.

      B. *Deliberate Indifference Claims*

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at

serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

The treatment Mr. Mikel received for each of his conditions is discussed below. In addition, because defendant Megan Miller seeks summary judgment on a slightly different ground, the claim against her will be discussed separately.

### 1. Neck Pain

With regard to Mr. Mikel's claim that that he suffers from neck pain, the Medical Defendants do not dispute that this condition presented a serious medical need. But they argue that they were not deliberately indifferent to Mr. Mikel's need for treatment for his severe neck pain, while Mr. Mikel argues that they were.

The Court finds that there are disputes of fact regarding whether the defendants were deliberately indifferent to Mr. Mikel's neck pain. While the Medical Defendants assert that Mr. Mikel's condition was moderate and that he could purchase over-the-counter medications to treat it, Mr. Mikel contends that his pain was and is severe and that he cannot afford to purchase medication from the commissary. Moreover, Mr. Mikel had been prescribed prescription pain medication for many years before it was stopped and there is at least a dispute of fact regarding whether Mr. Mikel's condition had improved and thus altering his medication was appropriate or whether his condition was severe and required prescription treatment. The Medical Defendants also assert that the medication was stopped based on a "facility-wide protocol" and suggest that prolonged use of NSAIDs such as Naprosyn would be harmful to Mr. Mikel. But an amorphous "facility-wide protocol" is not a sufficient explanation for the abrupt change in his treatment. And, if it is true that Mr. Mikel's use of NSAIDs would have negative side effects, the Medical Defendants' direction to Mr. Mikel that he should purchase such medications on his own from the commissary is troubling. Further, the Medical Defendants assert that other treatments for Mr. Mikel's condition might include steroid injections, ice or heat therapy, and exercise or physical therapy, but there is no evidence that any of these treatments were provided to him.

Based on these facts, a jury might conclude that Mr. Mikel was directed to purchase medication from the commissary that he could not afford, that was insufficient, and that, according to the Medical Defendants themselves, could produce harmful side effects. These findings might lead a reasonable jury to conclude that the Medical Defendants ignored Mr. Mikel's pain or failed to treat it. *See Freeman*, 394 F.3d at 478. A reasonable jury might also conclude that other avenues for treating Mr. Mikel's pain were available, but not provided to him

and that this amounted to deliberate indifference. In light of these disputes of fact, a reasonable jury might or might not conclude that the Medical Defendants were deliberately indifferent to Mr. Mikel's neck pain. The Medical Defendants and Mr. Mikel are therefore not entitled to summary judgment on his claims based on his neck pain.

      2. GERD

The parties also seek summary judgment on Mr. Mikel's claim that he was provided with insufficient treatment for his GERD. Again, the Medical Defendants do not argue that this condition is not serious, but argue that they were not deliberately indifferent to it.

There are also disputes of fact regarding whether the Medical Defendants were deliberately indifferent to Mr. Mikel's GERD. The Medical Defendants argue that this condition is intermittent and is controlled when Mr. Mikel avoids foods that aggravate it. On the contrary, Mr. Mikel describes his condition as severe and ongoing, occurring every time he eats or lays down. There is thus a dispute of fact regarding the severity of this condition. The Medical Defendants also argue that Mr. Mikel ordered spicy foods from the commissary despite recommendations to avoid spicy food and suggest therefore has contributed to his own suffering. But a review of the commissary records presented reveals only a few purchases of spicy foods over the course of a year. Dkt. 90-3. Further, the commissary records show only that Mr. Mikel purchased the food, but not that he ate it and do not provide a sufficient explanation for Mr. Mikel's contention that he experiences painful heartburn every time he eats. Next, the Medical Defendants also argue that, like his prescription for Naprosyn, his prescriptions for Zantac and Prilosec were stopped pursuant to a "facility-wide protocol" and that Mr. Mikel was directed to purchase this medication from the commissary. Again, a "facility-wide protocol" is not a

sufficient reason to cease treatment of a condition that a provider apparently believed required treatment. And, as previously discussed, Mr. Mikel asserts that he could not afford to purchase medications from the commissary. Again, a jury might conclude that the Medical Defendants were aware of Mr. Mikel's need for treatment and failed to treat him. A reasonable jury thus might or might not conclude based on these facts that the Medical Defendants were deliberately indifferent to Mr. Mikel's GERD.

       3. Hernia

The parties also seek summary judgment on Mr. Mikel's claim based on his hernia.

The Medical Defendants argue that Mr. Mikel does not have a hernia, but instead has a condition called diastasis recti which does not require treatment. They also argue that he does not need a hernia belt and that he "does not meet the facility's criteria for a bottom bunk pass." Mr. Mikel points out that his condition is noted as a hernia in numerous places in his medical records. He also argues that his condition – whether it is considered to be a hernia or something else – is very painful and it feels like his insides are "popping out." Further, while the Medical Defendants point out that Mr. Mikel saw an outside physician to evaluate this condition, Mr. Mikel states that this physician did not examine him. Thus, this opinion is in dispute. Moreover, it is undisputed that Mr. Mikel has not received any treatment for this condition and that it causes him pain. In addition, the Medical Defendants assert that Mr. Mikel is not at risk of injury because of this condition, but Mr. Mikel states that it feels like it is getting worse. These are all disputes of fact regarding whether Mr. Mikel needs treatment for his condition and whether the Medical Defendants have ignored his need for treatment. No party is entitled to summary judgment on this claim.

### 4. Allergies

The parties also each seek summary judgment on Mr. Mikel's claim that his allergies to aspirin and bleach have been ignored. Mr. Mikel contends that the defendants have failed to document his allergies to bleach and aspirin. The defendants state that Mr. Mikel is not allergic to bleach or aspirin, and conclude that it was not deliberate indifference not to document that Mr. Mikel has these allergies. Further, Mr. Mikel has not been prescribed aspirin and has not identified any medication that he has been prescribed that contains bleach. To the extent that doctors have recommended that he take Aleve, there is no evidence that this medication contains aspirin or bleach. Because there is no evidence that Mr. Mikel has been prescribed medications to which he is allergic or that he has otherwise suffered any injury, the defendants are entitled to summary judgment on this claim. Because Mr. Mikel's only claim against NP Ivers is that she did not enter allergies to bleach and aspirin into his medical record, she is entitled to summary judgment on all claims against her.

### 4. Claims against HSA Miller

Finally, HSA Miller seeks summary judgment on Mr. Mikel's claims against her arguing that she assisted with a response to a grievance filed by Mr. Mikel and stated that he still had active prescriptions for Prilosec and Naproxen. HSA Miller seeks summary judgment arguing that at the time, she believed that Mr. Mikel was receiving his medications based on NP Brubaker's order for these medications.

HSA Miller argues that she is entitled to summary judgment on Mr. Mikel's claims because she did not intentionally refuse or fail to provide him with care, but instead simply misunderstood his medical records. She argues that her failure to read his medical records correctly does not demonstrate a total lack of concern for his welfare.

In response to a grievance in which Mr. Mikel complained that he was not receiving his medications, HSA Miller reviewed his file and found no documentation to support his contention that his medication was discontinued and suggested that he file a healthcare request if there was an oversight. Dkt. 78-17, pg. 37. Though his records reflected that he was prescribed medications, Mr. Mikel stated that he was not receiving them. A reasonable jury might conclude that, in response to a complaint that Mr. Mikel was not *receiving* his medications, she should have done more than merely review the records and respond that his medications were *prescribed*. Based on this evidence, a reasonable jury might or might not conclude that Ms. Miller was presented with information that would have alerted her to an excessive risk to Mr. Mikel's health. *See Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011). Neither party is therefore entitled to summary judgment on this claim.

## IV. Conclusion

As discussed above, there are disputes of fact regarding the care provided to Mr. Mikel. Accordingly, Mr. Mikel's motion for summary judgment, dkt. [83], is **denied**. The Medical Defendants' motion for summary judgment, dkt. [89], is **granted in part and denied in part**. The motion is **granted** as to all claims against NP Perkins and Nurse Ivers. The **clerk shall terminate** these defendants on the docket. The motion is also **granted** as to all claims based on

Mr. Mikel's alleged allergies. The motion is in all other respects **denied**. No partial final judgment shall issue as to the claims resolved in this Entry.

Because the motions for summary judgment have been ruled on without the need for the appointment of medical experts, the motions for appointment, dkt. [109] and [113], are **denied without prejudice**.

The Court will direct further proceedings in this action through a separate order. If Mr. Mikel seeks the assistance of counsel, he should file a motion on the Court's form. The **clerk shall** include a form motion for assistance with recruiting counsel with Mr. Mikel's copy of this Entry.

**IT IS SO ORDERED.**

Date: 9/7/2018

*Signature*

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

DENNIS MIKEL
972897
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

All electronically registered counsel